## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FOND DU LAC BAND OF LAKE SUPERIOR CHIPPEWA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| CONSTANCE CUMMINS, Supervisor of the Superior National Forest; | ) ) ) ) | Case No. 22-cv-00170 |
| RANDY MOORE, Chief of the U.S. Forest Service; | ) ) ) | |
| UNITED STATES FOREST SERVICE; | ) ) ) | |
| THOMAS VILSACK, Secretary of Agriculture; and | ) ) ) | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, | ) ) ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, the Fond du Lac Band of Lake Superior Chippewa ("Band" or "Fond du Lac Band"), complains and alleges as follows:

### I.    INTRODUCTION

1.    This action concerns the failure of the United States Forest Service ("Forest Service") to defend the Band's and public's interests in 6,650 acres of land containing pristine wetlands and habitat within the Superior National Forest

("Federal Land").  On January 9, 2017, the Forest Service capitulated to a purported "risk" of litigation with PolyMet Mining, Inc. ("PolyMet") and approved the exchange of the Federal Land for four scattered tracts of private land of inferior value, including one tract of land previously used as an unauthorized dump site ("Non-Federal Lands").  The Band brings this action to enforce the 1854 Treaty of LaPointe, Weeks Act, Federal Land Policy and Management Act ("FLPMA"), National Environmental Policy Act ("NEPA"), and Administrative Procedure Act ("APA"), with regard to the Forest Service's land exchange with PolyMet of the Federal Land for the Non-Federal Lands ("Land Exchange").

2.    The United States acquired the Federal Land in 1935 pursuant to the Weeks Act, 16 U.S.C. § 515, for the purpose of protecting the headwaters of the St. Louis River, which is downstream of the Federal Land and flows through the Fond du Lac Reservation.  The Weeks Act only authorizes the Forest Service to exchange the Federal Land if the land to be acquired is "chiefly valuable" for the purpose of "regulation of the flow of navigable streams or for the production of timber." *Id.* §§ 515, 516.  The Forest Service violated the Weeks Act because the Non-Federal Land is not chiefly valuable for either of these two permissible purposes.  Rather, the chief purpose of the Land Exchange was to avoid a purported "risk" of litigation with PolyMet regarding PolyMet's "desire" to use the Federal Land to develop an extensive open-pit mine ("Mining Project"), which would result in the largest permitted destruction of wetlands in Minnesota's history.

3. The Forest Service also has no authority to impair, limit, or abrogate the Band's Treaty rights. In 1854, the Band ceded a large portion of land in northeastern and east-central Minnesota ("Ceded Territory"), under the Treaty of LaPointe, 10 Stat. 1109, in exchange for, *inter alia*, the right to hunt, fish, and gather throughout the Ceded Territory and the establishment of the Fond du Lac Reservation as the Band's permanent homeland. Despite the fact that the Forest Service acknowledged the Land Exchange affected the Band's Treaty rights and would result in irreversible losses of Treaty resources, the Forest Service utterly failed to give effect to the Treaty rights and the Forest Service's fiduciary responsibility to protect those rights and the resources upon which they depend.

4. PolyMet's mine would destroy a large intact area of pristine wetlands, operate for 20 years, and require wastewater treatment both during the mine's operation as well as perpetually after the mine closes. The Mining Project, as currently permitted, will be a source of pollution in northern Minnesota in perpetuity, impairing the Band's Treaty rights to hunt, fish, and gather in the Ceded Territory where the mine will be located as well as in the Reservation which is located approximately 70 miles directly downstream from the proposed mine.

5. The Forest Service's decision to approve the Land Exchange is contrary to law, arbitrary and capricious, an abuse of discretion, in excess of statutory authority, and in derogation of the federal government's Treaty and trust obligations to the Band. The Band prays that this Court (1) declare that the Land Exchange violates federal law and is therefore void; and (2) vacate and set aside the Forest

Service's approvals of the Land Exchange and the Land Exchange itself, including related regulatory and real estate transactions associated therewith.

## II.    JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1362, 2201, and 2202.  This action also states claims under the APA, 5 U.S.C. §§ 701-706.

7.    The Forest Service's Final Record of Decision ("ROD") is final agency action because the Forest Service has made its final decision on the Land Exchange and no further administrative review is available or required.  In accordance with 36 C.F.R. Part 218, the Band timely submitted objections to the Land Exchange by letter dated January 4, 2016.  The Forest Service completed the pre-decisional objection and review process under 36 C.F.R. Part 218 by issuance of an Objection Response Letter to the Draft Decision for the NorthMet Mining Project and Land Exchange dated July 11, 2016, which states that "[t]his written response concludes the 36 CFR Part 218 administrative review process for the NorthMet Land Exchange decision by the Forest Service."  On January 9, 2017, the Forest Service issued its ROD approving the Land Exchange.

8.    Venue is proper in the District of Minnesota under 28 U.S.C. § 1391(e)(1), because Defendants are agencies or officers of the United States sued in their official capacities, the Plaintiff resides in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## III.    PARTIES

4

9.      The Band is a federally recognized Indian tribe and a member band of the Minnesota Chippewa Tribe. 86 Fed. Reg. 7554, 7556 (Jan. 29, 2021). The Band's governing body is the Reservation Business Committee. The Band's Reservation lies in the St. Louis River basin, approximately 70 miles directly downstream from the Mining Project. The Band has several direct and substantial interests in the Federal Land that are injured by the Land Exchange and which directly implicate the Band's sovereign interests, including a treaty right to use the land for hunting, fishing, and gathering; Treaty and cultural resources that would be destroyed and irreversibly lost; a loss of access to 6,650 acres of public land for exercise of the Band's Treaty rights; the effective removal of 6,650 acres of land from the Band's jurisdiction under its Ceded Territory Conservation Code; and the destruction of pristine wetlands and other ecological function and services ("ecological functions") provided by the Federal Lands. The completion of the Land Exchange has also resulted in direct impacts to the Band because the lands are no longer owned and managed by the Forest Service and, unlike the Forest Service, a private owner like PolyMet has no federal legal or trust responsibility to manage the lands in accordance with the Band's Treaty rights. After the Land Exchange was completed, all state and federal permits were issued to PolyMet to authorize open pit mining.

10.     Defendant Constance Cummins is Forest Supervisor of the Superior National Forest and is sued in her official capacity. On January 9, 2017, Defendant Cummins signed the ROD to approve the Land Exchange between the Superior National Forest and PolyMet Mining, Inc.

11.     Defendant Randy Moore is Chief of the U.S. Forest Service and is sued in his official capacity.  Defendant Moore is the highest official responsible for management actions carried out by the Forest Service, including the Land Exchange at issue in this action.

12.     Defendant U.S. Forest Service ("Forest Service") is an agency of the United States government and within the U.S. Department of Agriculture.  The Forest Service is charged with the responsibility of managing the national forests throughout the United States, including the Superior National Forest.

13.     Defendant Thomas Vilsack is the Secretary of Agriculture and he is sued in his official capacity.  As Secretary of Agriculture, Defendant Vilsack has ultimate responsibility for the administration and implementation of the Weeks Act and Federal Land Policy and Management Act with respect to land exchanges and the national forests.

14.     Defendant U.S. Department of Agriculture is an agency of the United States government which is charged with the ultimate responsibility for administering national forest lands, including lands held or exchanged under the Weeks Act.

## IV.    LEGAL BACKGROUND

### A. The Band's Treaty Rights in the Ceded Territory.

15.     "A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations." *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675 (1979).  "In carrying out its

treaty obligations with the Indian tribes the Government is something more than a mere contracting party . . . it has charged itself with moral obligations of the highest responsibility and trust." *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942).

16.     A treaty between an Indian tribe and the United States recognizes and guarantees rights existing from time immemorial: the treaty is "a grant of right from" the relevant tribe and "a reservation of those not granted." *United States v. Winans*, 198 U.S. 371, 381 (1905).

17.     Under the Treaty of LaPointe of September 30, 1854, 10 Stat. 1109, ("1854 Treaty") the Band ceded a large portion of land in northeastern and east-central Minnesota known as the Ceded Territory. *Id.* art. 1.  In Article 11 of the 1854 Treaty, the Band reserved "the right to hunt and fish therein . . . ." *Id.* "As a result of this provision, the Chippewas residing in Minnesota obtained treaty-recognized usufructuary rights on non-reservation lands." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 363 (7th Cir. 1983).  Band members "have continued to hunt and fish throughout the ceded territory since the adoption of the Treaty . . . ." *United States v. Gotchnik*, 222 F.3d 506, 508 (8th Cir. 2000).  The right to hunt and fish includes the right to harvest *all* natural resources in the Ceded Territory, with limited exceptions not applicable here.  The Treaty protects the Band's present and future right to hunt, fish, and gather within the Ceded Territory.  Article 2 of the 1854 Treaty also established the Fond du Lac

Reservation as the Band's permanent home, which remains the Band's Reservation to this day.

18.     This Court has affirmed the Band's usufructuary rights in the Ceded Territory reserved under the 1854 Treaty. *Fond du Lac Band of Chippewa Indians v. Carlson*, No. 5-92-159, slip op. at 55 (D. Minn. Mar. 18, 1996) ("*Carlson*"). This Court held that, under Article 11 of the 1854 Treaty, the Band reserved and continues to hold usufructuary rights in the Ceded Territory. *Id.*

19.     The Band's exercise of its 1854 Treaty rights requires natural resources that are not contaminated. *See Michigan v. U.S. EPA*, 581 F.3d 524, 525 (7th Cir. 2009) (recognizing that a tribe's "cultural and religious traditions . . . require the use of pure natural resources derived from a clean environment"). As such, natural resources within the Ceded Territory are an essential component of the Treaty rights.

20.     Federal agencies have the duty to consider and protect treaty rights in making decisions. *E.g.*, *Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515, 1519-20 (W.D. Wash. 1996) (citing *Seminole Nation*, 316 U.S. at 296-97). Absent express Congressional authorization, federal agencies do not have the authority to limit or otherwise impair treaty rights. *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999).

21.     The Forest Plan for the Superior National Forest expressly recognizes that the Superior National Forest has a role in maintaining the Band's Treaty rights "because it is an office of the federal government responsible for natural resource management on land subject to these treaties." The Forest Plan requires that the

first governing principle for all Superior National Forest lands is that "numerous treaties and trust responsibilities," including the 1854 Treaty, govern "the use and protection of forest resources that may be of Tribal interest or covered under Tribal reserved rights."

### B. Federal Land Policy and Management Act (FLPMA).

22.     FLPMA provides "a tract of land or interests therein within the National Forest System may be disposed of by exchange by the Secretary of Agriculture *under applicable law* where the Secretary concerned determines that the public interest will be well served by making that exchange . . . ." 43 U.S.C. § 1716(a) (emphasis added).

23.     FLPMA further provides:

> That when considering public interest the Secretary concerned shall give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife and the Secretary concerned finds that the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired.

*Id.*

24.     FLPMA requires that the "values of the lands exchanged . . . by the Secretary of Agriculture under applicable law relating to lands within the National Forest System either shall be equal, or if they are not equal, the values shall be equalized by the payment of money to the grantor or to the Secretary concerned as the circumstances require so long as payment does not exceed 25 per centum of the total value of the lands or interests transferred out of Federal ownership." *Id.* § 1716(b).

25.     FLPMA requires a valuation of the lands involved in a proposed land exchange through an appraisal. *Id.* § 1716(d)(1).  FLPMA directed the Forest Service to promulgate regulations governing appraisals of lands and which "shall reflect nationally recognized appraisal standards, including, to the extent appropriate, the Uniform Appraisal Standards for Federal Land Acquisitions" ("Uniform Appraisal Standards").   *Id.* § 1716(f)(2).   Accordingly, the Forest Service's implementing regulations require that an appraisal comply with the Uniform Appraisal Standards. 36 C.F.R. § 254.9.  The Forest Service's regulations also require the appraiser to estimate the market value of the lands to be exchanged by, in part, determining the "highest and best use" of the lands to be exchanged.  *Id.* § 254.9(b)(1)(i).

26.     The Forest Service's regulations also govern the determination of the public interest, *id.* § 254.3(b), and set forth several factors that must be given "full consideration," *id.* § 254.3(b)(1).  The Forest Service's regulations also require the authorized officer to find that:

(i) The resource values and the public objectives served by the non-Federal lands or interests to be acquired must equal or exceed the resource values and the public objectives served by the Federal lands to be conveyed, and

(ii) The intended use of the conveyed Federal land will not substantially conflict with established management objectives on adjacent Federal lands, including Indian Trust lands.

*Id.* § 254.3(b)(2).

### C. The Weeks Act.

27.     The Weeks Act is the "applicable law" that authorizes the Secretary of Agriculture to exchange the national forest land acquired under the Weeks Act.  16

U.S.C. § 516; *see also* 43 U.S.C. § 1716(a).  Section 7 of the Weeks Act, as amended,

provides:

> When the public interests will be benefited thereby, the Secretary of Agriculture is hereby authorized, in his discretion, to accept on behalf of the United States title to any lands within the exterior boundaries of national forests which, in his opinion, *are chiefly valuable for the purposes of this Act*, and in exchange therefor to convey by deed not to exceed an equal value of such national forest land in the same State, or he may authorize the grantor to cut and remove an equal value of timber within such national forests in the same State, the values in each case to be determined by him . . . .

16 U.S.C. § 516 (emphasis added).  In turn, the Weeks Act only authorizes the

Secretary of Agriculture to acquire land if the acquisition is necessary to protect the

watersheds of navigable streams or promote the production of timber on national

forest lands.  *Id.* § 515.  The Forest Service Manual for land exchanges confirms that

the "non-Federal land must be within the watershed of a navigable stream and must

be valuable chiefly for the regulation of the flow of that stream or for the production

of timber."  FSM 5430.11(2)(b).

28.   "The Weeks Act also directed that lands acquired for the National Forest

System 'shall be permanently reserved, held, and administered as national forest

lands.'"  *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1842

(2020) (quoting 16 U.S.C. § 521).  Thus, the Secretary of Agriculture is only

authorized to exchange lands acquired under the Weeks Act pursuant to section 7 of

the Weeks Act, 16 U.S.C. § 516; *see also id.* § 521.

29.   The Secretary of Agriculture has delegated the authority to administer

national forest lands to the Forest Service.  *See* 36 C.F.R. § 200.3(b)(2)(i).  The Forest

Service has promulgated regulations for land exchanges of national forest lands, including national forest lands exchanged under the Weeks Act.  *See id.* § 254.1; *see also id.* §§ 254.1-254.17.

### D. The National Environmental Policy Act ("NEPA").

30.    NEPA, 42 U.S.C. §§ 4321-4370m-12, is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a) (2017).[1]  NEPA makes environmental protection a part of the mandate of every federal agency.  42 U.S.C. § 4332(2).  NEPA requires federal agencies to take a "hard look" at environmental impacts of a federal action.  To that end, NEPA is intended to ensure that an agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts . . . ." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

31.    NEPA requires an agency to fully disclose all potential adverse environmental impacts of its action before deciding to proceed.  42 U.S.C. § 4332(2)(C).  NEPA also requires an agency to use high quality, accurate scientific information.  40 C.F.R. § 1500.1(b).  "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.*" Id.* § 1500.1(b).

32.    "When the federal government exchanges land, it must consider the environmental impact not only of the exchange itself, but also of the proposed use of

---

[1] All references herein to NEPA's implementing regulations are to those regulations in effect as of the Forest Service's decision on the Land Exchange on January 9, 2017.

the federal land once it passes into private hands." *Lockhart v. Kenops*, 927 F.2d 1028, 1033 (8th Cir. 1991) (citation omitted).

33.    A federal agency is required to prepare an environmental impact statement ("EIS") for a major federal action significantly affecting the quality of the human environment.  40 C.F.R. § 1502.3.  An EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.* § 1502.1.  An EIS must have an appropriate scope, which consists of the range of actions, alternatives, and impacts to be considered in the EIS.  *Id.* §§ 1501.7, 1508.25.  In particular, the EIS must consider direct and indirect effects.  *Id.* §§ 1508.25(c), 1508.8.  The direct effects of an action are those effects "which are caused by the action and occur at the same time and place." *Id.* § 1508.8(a).  The indirect effects of an action are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

34.    An EIS must also analyze the cumulative effects of a proposed project. *Id.* § 1508.25(c)(3); *see also* 36 C.F.R. § 220.4(f) (2017) (Forest Service regulation on cumulative effects considerations of past actions). Cumulative effects are the result of any past, present, or reasonably foreseeable future actions.  40 C.F.R. § 1508.7. Such effects "can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

35.    An EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives . . . ."  *Id.* § 1502.14(a).  "This section is the heart of the environmental impact statement."  *Id.* § 1502.14.  A federal agency must "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits."  *Id.* § 1502.14(b).  A federal agency must also "[i]nclude the alternative of no action."  *Id.* § 1502.14(d).  A federal agency must also "[i]nclude appropriate mitigation measures not already included in the proposed action or alternatives."  *Id.* § 1502.14(f).

36.    If more than one federal agency is involved in a group of actions directly related to each other, a lead agency or joint lead agencies are designated to "supervise the preparation of an environmental impact statement . . . ."  *Id.* § 1501.5(a), (b).

37.    A cooperating agency is an agency other than a lead agency which "has jurisdiction by law or special expertise with respect to any environmental impact involved in a . . . major Federal action significantly affecting the quality of the human environment."  *Id.* § 1508.5.  An Indian tribe and a lead agency may agree for the Indian tribe to become a cooperating agency in the NEPA process.  *Id.*

38.    A lead agency has the duty and responsibility to "[r]equest the participation of each cooperating agency in the NEPA process at the earliest possible time" and to "[u]se the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency."  *Id.* § 1501.6(a)(1), (2).

14

39.    "If the lead agency leaves out a significant issue or ignores the advice and expertise of the cooperating agency, the EIS may be found later to be inadequate." Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,030 (Mar. 23, 1981) (Answer 14b).

## V.    FACTS AND ALLEGATIONS

### A. PolyMet's NorthMet Mining Project.

40.    PolyMet's NorthMet Mining Project would be Minnesota's first copper-nickel-platinum mine. The Mining Project would be located within the Band's Ceded Territory and would lie approximately 70 miles upstream of the Fond du Lac Reservation. PolyMet's development of the Mining Project would result in the largest permitted destruction of wetlands in Minnesota's history. PolyMet seeks to construct the Mining Project on the Federal Land.

41.    The primary components of the Mining Project would be a copper sulfide ore open pit mine constructed on the Federal Land ("Mine Site") and a processing plant ("Plant Site"), connected by a network of transportation and utility corridors and water pipelines. At the Mine Site, PolyMet would destroy wetlands to construct the mine and other mine features. These activities will release significant amounts of mercury and methylmercury into downstream waters, including the St. Louis River. The Plant Site would be located approximately seven miles from the Mine Site. PolyMet would construct a tailings basin on top of an existing tailings basin that is currently contaminating groundwater and surface water. PolyMet would also discharge millions of gallons of polluted wastewater containing mercury,

methylmercury, and sulfate, among other pollutants, per day into headwaters of the Embarrass and Partridge Rivers.

42.     The Mining Project will pollute the Embarrass and Partridge Rivers, which are both headwaters of the St. Louis River.  Waters within the St. Louis, Embarrass, and Partridge Rivers are listed as impaired for certain pollutants under Section 303(d) of the Clean Water Act ("CWA"), 33 U.S.C. § 1313(d), such as for mercury in the water column and in fish tissue.  This includes the segment of the St. Louis River within the Reservation.  A listing as impaired under Section 303(d) of the CWA means, *inter alia*, that the listed water is not meeting water quality criteria for its designated use.

43.     The St. Louis River is the most significant and utilized fishery on the Reservation.  Since 2005, water quality data collected by the Band has demonstrated consistent exceedances of the Band's water quality numeric chronic criterion for mercury of 0.77 ng/L.  The Band's designated uses are also impaired and narrative standards exceeded, because fish tissue collected by the Band has shown mercury concentrations that exceed human health risk levels and has required advisories that recommend Band members limit consumption of traditional fish species.  Existing conditions require health advisories that Band members consume significantly less traditional fish species on a week-to-week basis than the amount necessary for their subsistence, cultural, and religious practices.

44.     Mercury contamination in fish is primarily caused by methylmercury. Methylmercury is an organic form of mercury that accumulates in fish and other

aquatic life.  Methylmercury persists and accumulates progressively up the food chain, producing toxic effects to humans and wildlife that consume fish with mercury in fish tissue.  Sulfate converts inorganic mercury into methylmercury through a process called mercury methylation.  In other words, sulfate plays a role in transforming mercury into methylmercury, which can then be readily accumulated in aquatic species.  As such, discharges of sulfate increase bioaccumulation of mercury in fish.

45.  Specific conductance is a water chemistry signature for mining discharges, including those proposed by PolyMet for the Mining Project.  Specific conductance is a water quality standard that reflects concentrations of dissolved ions, including metal and other contaminants from mining activities.  Specific conductance levels only gradually decrease downstream of mine discharge sites and excessive concentrations persist far downstream in the St. Louis River.  Sulfate is a major constituent of the measured specific conductance in the St. Louis River.  Specific conductance degrades water quality necessary to support the Band's reintroduction efforts of Lake Sturgeon, a critical cultural and Treaty resource, in the St. Louis River.  In the early 1900s, the Lake Sturgeon population was extirpated in the St. Louis River from habitat degradation, including pollution from upstream industrial sources.  The Band has been engaged in efforts to reintroduce Lake Sturgeon into the St. Louis River that will be impaired by the Mining Project.

46.   The Mining Project's contributions of sulfate will also adversely affect wild rice, a critical cultural and Treaty resource, in downstream waters, such as Second Creek and the Partridge and Embarrass Rivers.

47.   Pollutants, such as sulfate, mercury, and methylmercury, will seep from various components of the Mining Project, such as the tailings basin and seepage capture systems, to groundwater and then reach surface water.

48.   The Mining Project will adversely impact natural resources, including fish, plant and wildlife habitat, and water quality, through seepage and discharges of metals, sulfate, and other pollutants from mine facilities into the environment.

49.   PolyMet obtained a section 404 permit from the U.S. Army Corps of Engineers on March 21, 2019, which was the last key permit or approval needed to construct and operate the Mining Project.  That permit has since been suspended by the U.S. Army Corps of Engineers and other PolyMet permits have either been vacated or stayed by Minnesota courts.  But PolyMet has publicly stated that it "continues to make preparations to act on those permits as appropriate and assuming positive legal outcomes" and the "ultimate resolution of such actions is not reasonably likely to have a material adverse effect on its . . . results of operations."  The Land Exchange has had a determinative effect on permitting decisions for the Mining Project because those permits could not be issued unless PolyMet had the right to use the Federal Land for the Mining Project.

**B. The Land Exchange.**

18

50.    The United States acquired the Federal Land in 1935 pursuant to the Weeks Act for the purpose of protecting the headwaters of the St. Louis River. The Forest Service managed the Federal Land as part of the Superior National Forest and pursuant to its Treaty and trust responsibility obligations to the Band, until the Forest Service transferred the Federal Land to PolyMet through the Land Exchange. After the Land Exchange, the Federal Land no longer serves these purposes.

51.    Contrary to the Weeks Act, the purpose of the Land Exchange is to "eliminate the conflict" between the Forest Service and PolyMet regarding PolyMet's "desire" to construct and operate the Mining Project on the Federal Land. PolyMet leases mineral rights that were reserved when the Federal Land was conveyed to the Forest Service. The Forest Service "has taken the position that the mineral rights that were reserved when lands were conveyed to the United States in 1935 do not include the right to surface mine as proposed by PolyMet." PolyMet "disagrees" with the Forest Service's position and "argues that the mineral rights it seeks to utilize provide for access to the minerals by any mining method, including open pit or surface mining." The Forest Service claims this "conflict raises the possibility of litigation that has no certain outcome" and proposed the Land Exchange with the purpose to "eliminate this fundamental conflict" between the Forest Service and PolyMet.

52.    The Forest Service does not explain its conclusory statement that its "conflict" with PolyMet "raises the possibility of litigation that has no certain outcome." The Forest Service does not disclose or evaluate the merits of PolyMet's position that led to this "conflict."

53.     Nevertheless, the Forest Service proposed the Land Exchange to transfer the Federal Land, plus a cash payment of $425,000, to PolyMet in exchange for the Non-Federal Lands.  On January 9, 2017, Defendant Cummins signed the ROD approving the Land Exchange.

### 1. The Federal Land.

54.     The Federal Land consists of a large contiguous tract of 6,650 acres within the Ceded Territory and Superior National Forest.  Having the Federal Land under federal ownership serves the public interest because it furthers the purposes of the Weeks Act and the 1854 Treaty; provides several important ecological functions; supports and protects the Band's exercise of Treaty rights; and contains critically important and irreplaceable cultural resources.  There is no known existing contamination by hazardous materials on the Federal Land.

55.     The Federal Land is located within the One Hundred Mile Swamp and Upper Partridge River Site, which are designated as Sites of High Biodiversity Significance by the Minnesota Biological Survey ("MBS").  A Site of High Biodiversity Significance contains very good-quality occurrences of the rarest species, high-quality examples of rare native plant communities, and/or important functional landscapes. The One Hundred Mile Swamp is a large wetland of approximately 3,028 acres.  Much of One Hundred Mile Swamp consists of mature (80-plus years) black spruce and northern white cedar.  The One Hundred Mile Swamp drains into Yelp Creek, which is also located on the Federal Land and flows into the Partridge River.  The Upper Partridge River Site concerns the headwaters of the Partridge River, which, in turn,

20

is a headwater of the St. Louis River. The Partridge River regulates downstream water quality and hydrology in the St. Louis River. Approximately five miles of the Partridge River runs through the Federal Land. Thus, the Federal Land provides important ecosystem functions to both the Ceded Territory and the St. Louis River within the Reservation, including downstream water quality, flood control, biodiversity and unique, connected habitat for a variety of wildlife, including moose and other species culturally important to the Band.

56.     In fact, EPA has designated wetlands on the Federal Land as an aquatic resource of national importance. The wetlands on the Federal Land have high overall quality due to minimal or no disturbance. The Federal Land has approximately 2,000 acres of coniferous bog wetlands, which are very significant to the Band because Treaty resources such as cranberries, soft-leaved blueberries, sweet flag, and other plants the Band considers to be medicines are only available in coniferous bogs. These specific coniferous bog wetlands are unique because they consist of a large unbroken tract of coniferous bogs. The restoration of coniferous bogs is a very difficult and long process that has extremely low success rates.

57.     The Federal Land contains segments of at least two Ojibwe trails that have deep cultural and spiritual significance to the Band. Cultural resources cannot be separated from natural resources. These trails are part of an extensive network of water and overland routes that crisscross northeastern Minnesota. These trails connect communities, sacred sites, sugar bush, hunting, fishing, and ricing areas. An elder from the Bois Forte Band of Lake Superior Chippewa ("Bois Forte") said that a

trail is still walked at least once a year "to keep that trail alive."  Bois Forte, like the Band, is a signatory to the 1854 Treaty, member band of the Minnesota Chippewa Tribe, and shares the same traditional and cultural beliefs including as they relate to the exercise of Treaty rights.  The first trail is called the Beaver Bay – Lake Vermillion Trail ("BBLV Trail") and is eligible as a historic property under the National Historic Preservation Act ("NHPA").  A 2012 cultural landscape survey for the Project area found the area around the BBLV Trail had the feeling of a well-used portage trail and overland route.  The second trail was generically referred to as an "Indian Trail" in a 2012 survey and showed evidence of recent use.  A very well-established system of game trails is located near the Indian Trail.  The BBLV Trail and Indian Trail received significantly greater federal preservation protection prior to the Land Exchange because the Federal Land was in federal ownership.

58.  Prior to the Land Exchange, the uses of the Federal Land included uses such as management of plant, wildlife, and aquatic habitat for a diversity of species; the exercise of Treaty rights; and protection of the headwaters of the St. Louis River. And based on the ecological functions of the Federal Land, the Band's management objective for the Federal Land was to protect and maintain the ecological processes, composition, and structure.  These uses were governed by the Band's Conservation Code and the Forest Service's Forest Plan.

59.  The Federal Lands are bordered to a significant degree by other Superior National Forest lands.  Access to the Federal Lands may be had through

those Superior National Forest lands.  Access to the Federal Lands also may be had via the Partridge River, which flows through the tract.

## 2. The Non-Federal Lands.

60.    The Non-Federal Lands consist of four tracts of unremarkable private land scattered throughout the boundaries of the Superior National Forest.  The Forest Service refers to the four tracts as Tract 1, Tract 2, Tract 3, and Tract 4.  There are no known cultural resources on any of the Non-Federal Lands.  The Non-Federal Lands are located outside the St. Louis River watershed.  Prior to the Land Exchange, the Forest Service collected little, if any, hydrologic or water quality data for the Non-Federal Lands.

61.    Tract 1 is a single parcel of 4,926.3 acres.  Tract 1 has been used as an unauthorized dump site and contains hazardous materials.  Tract 1 is adjacent to private lands that may be used for light industry, commercial purposes, livestock, sanitary landfill, an airport, and utility facilities, among other uses.  The Forest Service proposes to designate 307 acres of Tract 1 as a Candidate Research Natural Area ("cRNA"), which means that public use of these acres for recreation will be "generally discouraged" by the Forest Service and can be "closed to public use when needed to protect botanical or other attributes from disturbances," Forest Plan at 3-34.

62.    Tract 2 consists of four separate parcels that total 381.9 acres. According to the Forest Service, access to Tract 2 is relatively difficult due to wetlands and private land restrictions.

23

63.    Tract 3 consists of four separate parcels that total 1,575.8 acres.  The FEIS says access to two of the parcels in Tract 3 is limited due to the distance from roads and wetlands that surround the land.

64.    Tract 4 is an unremarkable parcel of 160 acres.

### C. The Forest Service's Flawed Environmental Review of the Land Exchange and NorthMet Mining Project.

65.     The Forest Service is required by NEPA and its own regulations to evaluate the Land Exchange and Mining Project's environmental impacts and alternatives.  42 U.S.C. § 4332(2)(C); 36 C.F.R. § 254.3(g).  This environmental review must include an evaluation of impacts of not only the Land Exchange itself, but also the impacts of PolyMet's proposed use of the Federal Land for the Mining Project. *Lockhart*, 927 F.2d at 1033.  In 2010, the Forest Service joined the U.S. Army Corps of Engineers ("Corps") and Minnesota Department of Natural Resources ("MDNR"), as a joint lead agency for the environmental review that was already in progress.

66.    The Band was a cooperating agency in the preparation of the EIS based on the Band's regulatory authority and subject matter expertise.  In that role, the Band was assisted by the Great Lakes Indian Fish & Wildlife Commission ("GLIFWC"), an intertribal resource management agency that coordinates with the Band in natural resource monitoring and use within the Ceded Territory.  The Band was also joined by Bois Forte and the Grand Portage Band of Lake Superior Chippewa ("Grand Portage") as cooperating agencies (collectively, "Tribal Cooperating Agencies").  The Tribal Cooperating Agencies, GLIFWC, and the 1854 Treaty Authority (a natural resource management agency for the Bois Forte and Grand

Portage Bands) provided comments, analyses, recommendations, and proposals at each stage of environmental review for the Mining Project and Land Exchange, with the exception of the scoping process.  Despite the Band's involvement throughout the NEPA process as a cooperating agency, the Forest Service ignored the Band's special expertise and analyses without adequate justification, and instead relied on erroneous data and analyses developed primarily by PolyMet and its contractors.

67.    The Forest Service issued a Supplemental Draft Environmental Impact Statement ("SDEIS") in November 2013.  The SDEIS repeated many of the very substantial problems that the Band had previously identified and its recommendations for proper study and analysis were disregarded.  The Band submitted extensive detailed comments on the SDEIS identifying the Band's specific concerns, supported by expert analysis and recommendations for proper evaluation of the potential impacts of the Land Exchange and Mining Project.  The Band's comments, and those of the other Tribal Cooperating Agencies, emphasized the need to properly examine the impacts of the Land Exchange and Mining Project on a broad array of Treaty protected rights and resources, including, for example, the threat of increased mercury from the Mining Project given the existing levels of mercury in fish at levels that restrict human consumption, which impairs the ability of Band members to exercise their Treaty rights to sustain themselves in the Ceded Territory and within the Reservation.

68.    In November 2015, the Forest Service issued a Final EIS ("FEIS") for the Land Exchange and Mining Project.  The Band reviewed and commented on the

FEIS and found that it failed to address the deficiencies previously identified by the Band. The Band again submitted extensive detailed comments on the issues of concern, supported by expert analysis and recommendations on steps for a proper assessment of the Land Exchange. The Band also submitted objections to the Forest Service's draft ROD that identified these same deficiencies. The Forest Service's ROD approving the Land Exchange failed to address many substantive deficiencies in the FEIS and the Land Exchange that the Band identified. The ROD relied on, in very substantial respects, the FEIS and therefore the errors contained in the FEIS are carried forwarded in the ROD.

69.    The FEIS, like the SDEIS before it, eliminated alternatives that could provide mitigation for or prevent long-term environmental damage. For example, the FEIS stated that underground mining was eliminated as an alternative "because it was found to be economically infeasible" in an analysis from 2013. The FEIS also eliminated the Mine Site Exchange-only alternative, under which the Forest Service "would have conveyed only the federal land . . . that would actually be used for the NorthMet Project Proposed Action." The Forest Service arbitrarily and unreasonably eliminated the Mine Site Exchange-only alternative because PolyMet needs more land to comply with air quality requirements that otherwise would not be met at the boundary of the Mine Site. The Forest Service accepted this excuse at face value and refused to evaluate whether the Mine Site Exchange-only alternative would provide more environmental benefits if PolyMet had to modify the Mining Project to meet air quality requirements at the Mine Site boundary. The Band, in its comments and

objections, provided information explaining why various alternatives were inappropriately and unreasonably disregarded, such as underground mining, dry-stack tailings, and the Mine Site exchange-only alternative.

70.     The ROD arbitrarily and unreasonably discounts the No Action Alternative, under which "there would be no NorthMet Mining Project Proposed Aciton or Land Exchange Proposed Action."  The ROD admits "the Land Exchange No Action Alternative is the environmentally preferred alternative."  Yet the ROD arbitrarily discounted the No Action Alternative because it "does not meet the USFS purpose and need for the land exchange."  The ROD says the No Action Alternative "does not address the conflict resolution needed between the USFS position that the mineral rights that were reserved do not include the right to surface mine as proposed by PolyMet, and PolyMet's position that the mineral rights it seeks to utilize provide for access to the minerals by any mining method, including open pit or surface mining."  The ROD claims a "risk exists that litigation could result in a situation where the mining project is proposed and evaluated for approval without any non-federal land acquired in a land exchange."  The FEIS and ROD's statements are conclusory and unsupported by any analysis regarding the extent of the risk or the relevant factors that affect such risk.  The FEIS and ROD do not disclose or evaluate the speculative "risk" of litigation in order to allow any meaningful comparison between the No Action Alternative and the Land Exchange.

71.     The Forest Service contends there will be a "net increase" of 505.5 acres of wetlands to the federal estate.  The Forest Service fails to adequately compare the

resource values of the wetlands on the Federal Land to those found on the Non-Federal Lands. The value of a particular wetland is based on its function, not a simple recitation of the number of acres. On the Federal Land, approximately 92% of the wetlands are of high value, meaning they have high ecological function and support a high level of biological diversity. The Federal Land also contains portions of the One Hundred Mile Swamp. The EPA also recognizes the wetlands on the Federal Land as an aquatic resource of national importance.

72. The Forest Service failed to take a "hard look" and adequately analyze the economic benefits that the ecological functions within the Federal Land provide to the Band and its exercise of its Treaty rights within the Ceded Territory as well as to the Band's downstream Reservation or the impact that removing the Federal Land from Superior National Forest and destroying those ecosystems will have on the Band, its Treaty rights, and downstream Reservation. With respect to cultural resources, the Forest Service could not identify any cultural resources on the Non-Federal Lands. By comparison, the Federal Land contains several important cultural resources, such as the BBLV Trail and Indian Trail, moose habitat, coniferous bogs, and natural resources and ecological functions essential to the exercise of the Band's Treaty rights on the Federal Land, within the Ceded Territory, and on the Reservation.

73. Contrary to NEPA and principles of environmental justice, the Forest Service failed to evaluate the impact that allowing the destruction of the BBLV Trail and Indian Trail on the Federal Land will have on the Band or analyze means to

mitigate those adverse effects, such as conditions or restrictions to prevent the destruction of these trails.

74.     The Forest Service identifies effects to certain wildlife, like moose, but fails to identify or evaluate any mitigation for these effects.  Moose, for example, is a critically important cultural and Treaty resource to the Band.  The Band has a core of members who pursue moose every year, including members who have participated in moose hunts in the vicinity of the Federal Land for at least thirty years.  Given the low density at which moose populate the Ceded Territory, Band members' demand for moose hunting exceeds the supply.  Increased temperatures as a result of climate change will increase heat stress and lead to increased mortality within the Ceded Territory's remaining moose population.  Changes in land ownership and forest management practices significantly adversely affect the quantity and quality of moose habitat, especially for thermal refuges in warmer weather.  Moose habitat that provides thermal cover is located on the Federal Land and aerial and ground surveys identified a substantial moose population in the area.  Federal and Band management of this high-quality habitat is needed to slow population declines and maintain and recover moose in appreciable numbers in the Ceded Territory.  The FEIS admits 2,785.9 acres of moose habitat would be directly and adversely affected by the Mining Project and this "would likely affect moose individuals in the vicinity through habitat loss and fragmentation."  But the Forest Service failed completely to consider mitigation to address effects to moose.  EPA and the Band identified this flaw during the environmental review process.  However, neither the FEIS nor the

ROD contains any discussion of mitigation measures to address the Land Exchange and Mining Project's effects on moose. For other wildlife, like certain species of small game, the Forest Service fails to analyze the Land Exchange and Mining Project's effects on those species and their impacts on the Band's Treaty rights.

75.   Similarly, the Forest Service failed to adequately analyze, or analyze at all, the Land Exchange and Mining Project's effects on plants, including the wild plants harvested by the Band, and their impacts of the Band's Treaty Rights.

76.   Despite the Band repeatedly raising concerns regarding water quality under its jurisdiction and expertise, the Forest Service did not evaluate the Land Exchange and Mining Project's effects on the Band's downstream waters within the Reservation and Treaty resources that depend on those waters. The Band has Treatment-as-State status under the Clean Water Act, 33 U.S.C. § 1377(e), and federally approved water quality standards that apply to all waters within the Reservation, including the St. Louis River. *See* Water Quality Standards of the Fond du Lac Reservation, https://www.epa.gov/sites/default/files/2014-12/documents/chippewa-tribe.pdf. The Land Exchange and Mining Project will affect the Band's water quality in several ways, such as by changes in land management, hydrology, mercury methylation and bioaccumulation of mercury in aquatic life, and the effects of specific conductance on the Band's efforts to restore Lake Sturgeon in the St. Louis River. In turn, Band members, Treaty resources, and Reservation lands and waters will be affected. The FEIS does not analyze these effects. By its own terms, the FEIS is limited to evaluating effects in watersheds of the Embarrass and

Partridge Rivers, which excludes the St. Louis River within the Reservation.  The Forest Service is required to identify and evaluate the Land Exchange and Mining Project's effects that will or may affect the environment, including those effects on the Band's downstream waters and Reservation.  40 C.F.R. § 1508.3 (affecting "means will or may have an effect on").  These are concrete and real impacts, as the EPA has determined that the Mining Project's discharges may affect the Band's downstream water quality and raises issues regarding the Band's Treaty rights and environmental justice. The Band subsequently determined that the discharges will affect its downstream water quality and creates impacts to the Band's Treaty rights and environmental justice principles.

77.    The FEIS contains the statement that the Mining Project "would not add to any potential exceedance of the Fond du Lac mercury water quality standard of 0.77 ng/L within the Reservation." This statement is completely unsupported and contrary to the Clean Water Act. PolyMet proposes to discharge mercury from its wastewater treatment plant at Minnesota's mercury water quality standard of 1.3 ng/L, which is roughly twice the concentration as the Band's standard.  It is inconceivable that the water discharged at 1.3 ng/L mercury from the wastewater treatment plant could meet the Band's lower standard when those waters reach Reservation waters and wetlands.  Regardless, there is no data or other relevant information in the FEIS to support that the Band's lower standard would be met in the St. Louis River at the Reservation, and no consideration is given to methylmercury in water or other media.  The FEIS also does not include or evaluate

PolyMet's discharges of mercury, sulfate, and methylmercury that will reach surface water via groundwater, nor PolyMet's discharges of mercury and methylmercury from the dewatering of peat wetlands at the Mine Site.  The Mining Project will cause and contribute to exceedances of the Band's water quality standards related to mercury in fish.  But the FEIS failed to consider and analyze these impacts.

78.     Within the watersheds of the Partridge and Embarrass Rivers, the FEIS reached conclusions about hydrology and water quality based on models that were not designed for those purposes, were improperly calibrated, or failed to model for significant pollutants.

79.     For example, to model mercury, the FEIS used a "simple mass balance" estimation model.  The Forest Service rejected other models suggested by EPA and the Band that were more appropriate for mercury, because "[a]daptive management has also been identified within the FEIS process that could reduce mercury concentrations if necessary."  The FEIS also says a mass balance model for mercury was chosen "because it incorporated the important input and removal processes for mercury, was very transparent with regard to data inputs, and allowed for easy assessment of the effects of changing parameter values on mercury concentrations." This explanation is arbitrary.  First, the mass balance model does not include inputs relevant to sulfate and methylmercury, which flatly contradicts the FEIS's claim that the model "incorporated the important input . . . processes for mercury."  Second, *any* reliable model should be "very transparent with regard to data inputs" and allow "for easy assessment of the effects of the changing parameter values on mercury

concentrations." This is an arbitrary basis to select a mass balance model over other models that are more appropriate for modeling mercury.

80.     The FEIS acknowledges that the Federal Land is within the jurisdiction of the Band's Conservation Code for the Ceded Territory. Under the Conservation Code the Band regulates Band members' exercise of Treaty rights within the Ceded Territory. In addition, the Band actively manages, studies, and surveys Treaty resources in the Ceded Territory, including the Federal Land, in coordination with state agencies and the Forest Service to maintain Treaty resources now and for future generations.

81.     In these and other ways, the Band identified and commented on deficiencies in the FEIS but the Forest Service failed to address them in the ROD. For example, the Band also submitted extensive comments on the Forest Service's inadequate or compete failure to include any analysis of the Land Exchange and Mining Project's effects on wildlife corridors, plants and aquatic species. Similarly, the FEIS failed to take a "hard look" and include a robust analysis of impacts to climate change, including based on air emissions and water discharges as well as destruction of natural and cultural resources, as a result of the Land Exchange and Mining Project.

82.     Despite the Band's status as a cooperating agency, its comments on the deficiencies of the FEIS, the Forest Service did not substantively engage the Band in any of the Forest Service's further analysis on the issues raised by Band.

    **D. The Forest Service's Flawed Evaluation of the Band's Treaty Rights.**

83.     The Forest Service failed to properly evaluate the Band's Treaty rights and resources.  Consequently, the Forest Service's Land Exchange impaired the Band's Treaty rights without Congressional authorization.

84.     The Forest Service imposed an improper test on the Band's Treaty rights.  The Forest Service required the Band to prove "present day or recent past subsistence gathering in the NorthMet Project area" as a necessary predicate to afford federal protection to the Treaty resources.  This is contrary to law and constitutes a limitation on the Band's Treaty rights entirely of the Forest Service's own invention.

85.     Even on its own terms, the Forest Service's flawed view of the Band's Treaty rights is arbitrary and contrary to the record.  Elders disclosed that members of the Minnesota Chippewa Tribe use the Federal Land for hunting, fishing, and gathering of maple sugar, berries, and birch bark.  But the Forest Service demanded that the elders identify "specific locations or uses within the NorthMet Project area." In claiming to have "little information . . . on current tribal uses within the federal parcel," the Forest Service entirely failed to consider that the Band's sharing of information regarding the exercise of Treaty rights is limited because the information is often misused or exploited at the expense of the resource, individual, or Band.  The Forest Service also entirely failed to consider that, in the Ojibwe tradition, it is considered taboo to discuss these activities with others and is prohibited for another to ask.

34

86.     The Forest Service ignored that the Federal Land is part of an extensive cultural landscape the Band has used and would use in the future for the exercise of Treaty rights but for the Land Exchange.  In fact, Band members who now live miles away return to areas of cultural importance to exercise Treaty rights because they feel compelled to hunt, fish, and gather in a specific place.  The BBLV Trail and Indian Trail cross the Federal Land.  These trails are key to the exercise of Treaty rights.

87.     The Forest Service improperly elevated "public access" to disregard the Band's Treaty rights.  As a matter of law, a denial of access does not, and could not, diminish the Band's Treaty rights.  *Winans*, 198 U.S. at 381.  The Forest Service merely speculates that the "little specific information concerning the use of natural resources by the Bands . . . likely reflects present day or recent past subsistence gathering in the NorthMet Project area due to general inaccessibility."  To the contrary, it is taboo and prohibited for Band members to share this information, an aspect the Forest Service failed to consider.  The Forest Service also does not consider that the transfer of, and destruction of Treaty resources on the Federal Land is permanent and irreversible.

88.     The Forest Service further discounted the Band's Treaty rights by relying on its arbitrary and inadequately explained claim of a "risk" of litigation with PolyMet if the Forest Service selected the No Action Alternative.

89.     The ROD claims "there is no expected change in fish mercury concentrations, and no subsequent change in human health risks related to fish

consumption." This arbitrary statement fails to disclose and acknowledge that the current "human health risks related to fish consumption" are extreme, as the existing risk of engaging in subsistence fishing practices is up to 15 times EPA's safe risk intake level for a pregnant mother or child under the age of 15.

90. Lands within the Ceded Territory that experience private development are permanently lost as a source of Treaty resources. The Non-Federal Lands have experienced such development and are not, and cannot be, an adequate substitute for the pristine and undisturbed nature of the Federal Lands. Only Congress can impair or diminish Treaty rights and Congress has not given the Forest Service authority to impair the Band's Treaty right so long as the Forest Service purportedly provides substitute benefits to the Band. The Forest Service failed to disclose, acknowledge, or consider the disproportionate impacts of the Land Exchange on the Band, as it is a large conversion of pristine and undisturbed public land to private use within the Ceded Territory on top of many other past conversions of federal land within the Ceded Territory and the Superior National Forest more specifically.

91. The Forest Service claims "[c]onstruction and operation of the NorthMet Project Proposed Action is not likely to significantly reduce overall availability of 1854 Treaty resources that are typically part of subsistence activities in the 1854 Ceded Territory." This contention is completely unsupported. The Forest Service refused to use the Ceded Territory as the scope for evaluating the Land Exchange and Mining Project's impacts, which would have provided the appropriate scope for the Forest Service to evaluate the "overall availability of 1854 Treaty resources . . . in the 1854

Ceded Territory." The Forest Service also failed to evaluate the Land Exchange and Mining Project's impacts on the Band's downstream waters and Treaty resources.

92.     Based on the Forest Service's flawed view of the Band's Treaty rights, the Forest Service failed to account for the irreversible losses of Treaty resources. The Forest Service itself conceded the Land Exchange and Mining Project will cause irreversible losses of Treaty resources. As such, the Forest Service had no authority to proceed with the Land Exchange because the Forest Service cannot impair or limit the Band's Treaty rights without express Congressional authorization. For example, the Forest Service acknowledged that the Land Exchange would result in a net decrease on the federal estate of coniferous bog wetlands, an important Treaty resource. The Federal Land contains approximately 2,000 acres of coniferous bog wetlands. The Forest Service does nothing to account for this significant loss of Treaty resources. Likewise, for example, the Forest Service fails to account for the loss of moose habitat on the Federal Land, or how the loss will impact moose within the Federal Land and throughout the Ceded Territory. And the FEIS's inadequacies with respect to the Land Exchange and Mining Project's impacts significantly understate the loss of Treaty resources on the Federal Land and within the Ceded Territory. Therefore, the Land Exchange diminished the supply of Treaty resources within the Ceded Territory and subject to the 1854 Treaty.

### E. The Forest Service's Flawed Determination of the Public Interest.

93.     In the ROD, the Forest Service contends "the public interest is well served" by the Land Exchange. The Forest Service's determination of the public

interest and findings are undermined and rendered inadequate and arbitrary by the flaws in the FEIS and the Forest Service's evaluation of the Band's Treaty rights. The Forest Service also failed to consider the purposes of the Weeks Act in determining the public interest.  In addition, the resource values and public objectives served by the Non-Federal Lands do not equal or exceed those of the Federal Land; and PolyMet's intended use of the Federal Lands will substantially conflict with management objectives on adjacent Federal lands, including Indian Trust lands and protection of Treaty resources.  *See* 36 C.F.R. § 254.3(b)(2)(i)-(ii).

94.    In any land exchange, the Forest Service "shall reserve such rights or retain such interests as are needed to protect the public interest or shall otherwise restrict the use of Federal Lands to be exchanges, as appropriate."  *Id*. § 254.3(h). The Forest Service failed to analyze conditions or restrictions that would prevent the destruction of the BBLV Trail and Indian Trail.  As a result, Band members now and future generations will not be able to practice time-honored cultural and ceremonial activities related to the BBLV Trail and Indian Trail.  Similarly, the Forest Service failed to analyze necessary conditions or restrictions of the Federal Lands as they relate to the Band's Treaty rights and resources and the Forest Service's trust responsibility to the Band.

### F. The Forest Service's Failure to Comply With FLPMA's Equal Value Requirement.

95.    Contrary to FLPMA, 43 U.S.C. § 1716(b), the Forest Service failed to receive equal value from PolyMet for the Federal Land because the appraisal was flawed.  FLPMA requires an appraisal of the lands to be exchanged, 43 U.S.C. §

38

1716(d)(1), in accordance with the Uniform Appraisal Standards, *id.* § 1716(f)(2); 36 C.F.R. § 254.9.  The Forest Service obtained an appraisal for the Federal Land from William M. Steigerwaldt of Compass Land Consultants, Inc., dated July 7, 2015 (the "Appraisal").  The Appraisal did not evaluate the Federal Land's value for mining development because the Forest Service instructed the appraiser to not consider such use.  In particular, the Forest Service arbitrarily instructed the appraiser to include the "extraordinary assumption" that the "3rd party owner of the outstanding mineral rights does not have the right to surface mine, and the property owner is entitled to subjacent support."  This "extraordinary assumption" expressly excluded any valuation of the Federal Land for its potential mineral development for the purpose of determining the Federal Land's highest and best use and market value, even though PolyMet sought the Federal Land for this very purpose because the Federal Land is underlain by the NorthMet copper-nickel-platinum group metals deposit. The Land Exchange is fundamentally premised on the fact that copper-nickel open-pit mining will occur on the Federal Land to be conveyed to PolyMet and this use should have been evaluated in the Appraisal.

96.   The Forest Service's instruction to include the extraordinary assumption was arbitrary because it precluded the appraiser from evaluating whether mining was a reasonably probable and feasible use of the Federal Land.  The Uniform Appraisal Standards require, *inter alia*, an appraisal to consider uses that are "reasonably probable" to determine a property's highest and best use.  Uniform Appraisal Standards at 9.

97.   The Forest Service's instruction is also arbitrary because it precluded the appraiser from evaluating the possibility that the surface and mineral estate could be combined to make a mining use of the Federal Land.  A highest and best use may be a use that can be made by combination of land, such as the combination made possible by the Land Exchange.

98.   The Appraisal also did not consider the Federal Land's value for conservation, which is particularly relevant to the Federal Land because it protects the headwaters of the St. Louis River, contains a portion of the One Hundred Mile Swamp and wetlands designated by EPA as an aquatic resource of national importance, and provides other critical ecological functions.  These values have market value that the Appraisal should have considered. In fact, the Appraisal violates 36 C.F.R. § 254.9(b)(1)(iii) because it does not include the Federal Land's historic, wildlife, scenic, cultural, ecological, and conservation resource values.  The Federal Land has several such values that the appraiser should have considered.

99.   The Appraisal is inconsistent with FLPMA, the Forest Service's implementing regulations, and the Uniform Appraisal Standards.

100.   As a result, the Appraisal adopted an erroneous highest and best use of "timber investment" and significantly undervalued the market value of the Federal Land.

101.   The Appraisal also does not consider the contributory value of the mineral interest of the subsurface estate, contrary to 36 C.F.R. § 254.9(b)(1)(iv).

102.   As a result, the Forest Service arbitrarily and unlawfully accepted the Appraisal's value of the Federal Land as $3,658,000 based on a highest and best use for "timber investment."   The Non-Federal Lands were appraised at a value of $4,083,000 based on appraisals that have not been made public nor made available to the Band.  The Forest Service proposed and agreed to equalize the transaction with a cash payment of $425,000.

### COUNT I

### The Forest Service's Land Exchange is Contrary to the Weeks Act and in Excess of Statutory Authority

103.   Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

104.   The APA requires the Court to "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A), (C).  The Forest Service's Land Exchange under the Weeks Act is unlawful and must be set aside.

105.   First, the Forest Service did not acquire the Non-Federal Lands because they are "chiefly valuable for the purposes of" the Weeks Act.  16 U.S.C. § 516; *see also id.* § 515.  The Weeks Act authorizes the Secretary of Agriculture to accept land within the exterior boundaries of national forests only if such land is "chiefly valuable for the purposes of this Act," *id.* § 516, which are to acquire lands "necessary to the regulation of the flow of navigable streams or for the production of timber," *id.* § 515. The Non-Federal Lands are not "chiefly valuable" for either of these two permissible

statutory purposes. Rather, the Forest Service's purpose for acquiring the Non-Federal Lands was to avoid the "risk" of litigation with PolyMet. This is not a Weeks Act purpose. Accordingly, the Land Exchange violated the Weeks Act and exceeds the Forest Service's statutory authority because the Weeks Act prohibits the Forest Service from conveying the Federal Land, which "shall be permanently reserved, held, and administered as national forest lands." *Id.* § 521.

106. Second, the Non-Federal Lands are not of "equal value" to the Federal Lands including with respect to being "necessary to the regulation of the flow of navigable streams or for the production of timber." *Id.* § 515. The Forest Service made no findings whatsoever in this regard. The ROD contains only the conclusory assertion that the "decision complies with the Weeks Act of 1911." In addition, the Weeks Act does not allow for cash equalization payments in exchanges of lands acquired under the Weeks Act. Thus, the Forest Service's Land Exchange is arbitrary and capricious because the Forest Service failed to consider factors made relevant by Congress in the Weeks Act.

107. Third, the Forest Service violated 36 C.F.R. § 254.15(c)(ii) because the Forest Service accepted Non-Federal Lands that have reserved mineral interests that will interfere with the use and management of the lands and are inconsistent with the Weeks Act.

108. Therefore, the Forest Service's Land Exchange is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the Weeks Act; and in

excess of statutory authority.  16 U.S.C. §§ 515, 516, 521; 5 U.S.C. §§ 702, 706(2)(A), (C).

## COUNT II

**The Forest Service's Analysis of the Land Exchange and Mining Project's Environmental Effects and Alternatives is Arbitrary and Capricious, and Abuse of Discretion, or Otherwise Not in Accordance With Law**

109.   Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

110.   The APA requires the Court to "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  NEPA and its implementing regulations require the Forest Service to take a hard look at impacts that major federal actions will have on the human environment and alternatives thereto.  *See, e.g.*, 42 U.S.C. § 4332(2)(C); *Robertson*, 490 U.S. at 352.  The Forest Service must evaluate impacts of both the Land Exchange and Mining Project.  *Lockhart*, 927 F.2d at 1033.

A.   The Corps Failed to Meet Its Obligations to the Band as a Cooperating Agency.

111.   NEPA's regulations provide that the Forest Service "shall . . . [u]se the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency."  40 C.F.R. § 1501.6(a)(2).

112.   The Forest Service and Band agreed for the Band to serve as a cooperating agency in preparation of the FEIS for the Land Exchange and Mining Project due to the Band's special expertise in water quality for waters within the

Reservation located downstream from the Federal Land and Mining Project and with respect to its Treaty rights, including managing resources within the Ceded Territory.

113. In its role as a cooperating agency, the Band submitted numerous environmental analyses and proposals to the Forest Service for use in its environmental review and analysis for the Land Exchange and Mining Project.

114. The Forest Service failed to use the Band's environmental analysis and proposals to "the maximum extent possible." *Id.* § 1501.6(a)(2). Instead, the Forest Service used erroneous and inaccurate data and analysis in reaching its conclusions to support its ROD and approval of the Land Exchange. The Band provided and made available to the Forest Service better and more accurate information and analysis, but the Forest Service refused to incorporate this information into its analysis. As a result of the Forest Service's failure to consider and incorporate the input of the Band with expertise and regulatory authority in relevant areas, the Forest Service's analysis in both the FEIS and ROD is seriously flawed rendering it inadequate in numerous aspects relevant to the Band. The Forest Service violated 40 C.F.R. § 1501.6(a)(2), because it failed to explain or address why it did not use the Band's information and analysis "to the maximum extent possible consistent with its responsibility as lead agency." *Id.* § 1501.6(a)(2).

115. Therefore, Defendants' failure to meet its obligations to the Band as a cooperating agency was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with NEPA, CEQ regulations, and the APA.

44

B. <u>Arbitrary and Unreasonable Evaluation of Alternatives.</u>

116.    NEPA requires an EIS to discuss "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii).  A federal agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(2)(E).  An EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14(a), including "the alternative of no action," *id.* § 1502.14(d).  A federal agency's discussion of alternatives "is the heart of the environmental impact statement." *Id.* § 1502.14.  The Forest Service's evaluation of alternatives to the Land Exchange is arbitrary and unreasonable for several reasons.

117.    First, the Forest Service arbitrarily and unreasonably discounted the No Action Alternative, under which there would be no Land Exchange.  The Forest Service acknowledged that "the No Action Alternative is the environmentally preferred alternative."  Nevertheless, the Forest Service disregarded the No Action Alternative because it "does not meet the USFS purpose and need for the land exchange," which is to purportedly "address the conflict resolution" between the Forest Service and PolyMet and avoid the "risk" of litigation.  The Forest Service's statements are conclusory and unsupported by any analysis regarding the extent of the risk or the relevant factors that affect such risk, such as the deed restrictions on the Federal Land.  The Forest Service's analysis does not consider or disclose the information necessary to "[r]igorously explore and objectively evaluate" the No Action

Alternative. 40 C.F.R. § 1502.14(a). Neither the decisionmaker nor the public know what the risk is or the extent of such risk. Consequently, the Forest Service's analysis does not allow any meaningful comparison between the No Action Alternative and the Land Exchange.

118. Second, the Forest Service eliminated the underground mining alternative because it was "economically infeasible." The range of alternatives to be considered is determined by the statement of purpose and need, not the profit incentive of a mining company.

119. Third, the Forest Service arbitrarily and unreasonably eliminated the Mine Site Exchange-only alternative because PolyMet needs more land for the Mining Project as proposed to comply with air quality requirements. The Forest Service unreasonably eliminated the Mine Site Exchange-only alternative without any evaluation of whether the Mine Site Exchange-only alternative would result in environmental benefits if PolyMet had to alter the Mining Project to satisfy air quality requirements with less land.

   C. Arbitrary and Capricious Evaluation of Environmental Effects.

120. NEPA's regulations require the Forest Service to take a hard look at direct, indirect, and cumulative effects of the Land Exchange and Mining Project. 40 C.F.R. §§ 1508.7, 1508.8. The Forest Service's analysis of the Land Exchange and Mining Project's direct, indirect, and cumulative effects is inadequate in several respects.

121.   First, the Forest Service did not identify or evaluate the Land Exchange and Mining Project's direct, indirect, and cumulative effects on the Band's downstream waters and Reservation lands and resources that depend on those waters.

122.   Second, the Forest Service failed to adequately analyze the Land Exchange and Mining Project's direct, indirect, and cumulative effects on mercury in fish.  The Forest Service relied on a flawed mass balance estimation for mercury that cannot incorporate inputs and generate outputs relevant to methylmercury, which is the primary cause of mercury contamination in fish.  The Forest Service also failed to account for the Mining Project's discharges of mercury and methylmercury related to peat wetlands at the Mine Site, as well as the Mining Project's discharges of mercury, methylmercury, and sulfate that reach surface water via groundwater.

123.   Third, the Band proposed a scope for cumulative effects analysis that was appropriate for resources important to the Band and its Treaty rights.  The rationale for the Band's proposal was set forth in the Tribal Cooperating Agencies' Cumulative Effects Analysis submitted to the Forest Service in September 2013.  The Forest Service arbitrarily disregarded the Tribal Cooperating Agencies' Cumulative Effects Analysis in favor of an analysis with an inadequate scope for all resource categories.

124.   Fourth, the Forest Service arbitrarily and unreasonably failed to adequately analyze the Land Exchange and Mining Project's direct, indirect and cumulative effects on other environmental impacts on natural and cultural resources

raised by the Band, including wildlife corridors, plants and aquatic species, as well as impacts to climate change.

125.   Fifth, the Forest Service failed to analyze the direct, indirect and cumulative effects of removing the Federal Land from the Superior National Forest and the impacts that the removal would have on natural resources and ecological functions that support the Band's exercise of its Treaty rights.

126.   Sixth, the Forest Service failed to analyze and address the Land Exchange and Mining Project's environmental impacts for the reasons identified and explained in the Band's objections and comments submitted throughout the environmental and regulatory review process.

D.   Arbitrary and Capricious Analysis of Mitigation Measures for Purposes of NEPA.

127.   The Forest Service must take a hard look at mitigation measures to mitigate adverse environmental impacts and consequences in explaining their ultimate decision.   40 C.F.R. §§ 1502.16(h), 1505.2(c).   NEPA requires "that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Robertson*, 490 U.S. at 352.

128.   The Forest Service failed to identify, consider, or require adequate measures to mitigate the transfer and destruction of moose habitat, 2,000 acres of coniferous bogs, and the BBLV and Indian Trails on the Federal Land.

129.   The Forest Service failed to identify, consider, or require adequate measures to mitigate the loss ecological functions and habitat that will be impacted

as a result of the Federal Lands being transferred out of federal ownership and protection, including as it relates to the St. Louis Watershed.

      E.    <u>Arbitrary and Capricious Environmental Justice Analysis.</u>

130.    "The purpose of an environmental justice analysis is to determine whether a project will have a disproportionately adverse effect on minority and low income populations." *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 541 (8th Cir. 2003).   The Forest Service must give environmental impacts affecting Indian tribes a "hard look" in light of principles of environmental justice. Exec. Order No. 12,898, § 1-101, 59 Fed. Reg. 7629, 7629 (Feb. 16, 1994).   CEQ guidance provides general principles and factors for the Forest Service to consider in evaluating issues of environmental justice.   Council on Envtl. Quality, Exec. Office of President, *Environmental Justice: Guidance Under the National Environmental Policy Act* (1997) ("CEQ Guidance"),   https://www.epa.gov/sites/production/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf.

131.    The Forest Service failed to address instructions from the Regional Forester during the pre-decisional objection process to improve the evaluation of environmental justice issues.   The Regional Forester instructed Defendant Cummins to "provide a more concise and comprehensive disclosure of environmental justice issues in the ROD utilizing the [CEQ's] environmental justice guidelines."   One CEQ guideline provides for federal agencies to "recognize the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action."   CEQ Guidance at 9.

This includes the "physical sensitivity of the community or population to particular impacts; the effect of any disruption on the community structure associated with the proposed action; and the nature and degree of impact on the physical and social structure of the community." *Id.* In response to the Regional Forester's instruction to "provide a more concise and comprehensive disclosure," Defendant Cummins merely referenced several inadequate sections of the FEIS, totaling hundreds of pages The FEIS and ROD *still* does not disclose, recognize, or evaluate the cultural, social, and historical factors that amplify the environmental effects of the Land Exchange and Mining Project on the Band, such as the socio-economic and human health factors applicable to the Band, legacy pollution from mining and existing conditions that impair subsistence fishing, extensive losses of land and resources that support the exercise of Treaty rights, and the destruction of critical cultural resources. Contrary to the Regional Forester's instruction and CEQ guidance, the Forest Service refused to recognize and disclose these impacts and incorporate them into its analysis.

132. The Forest Service's claim that the "mining project would not disproportionately affect" minority and low-income populations is arbitrary. The Forest Service fails to adequately compare the characteristics of Band members with those of the general population. For example, the Forest Service fails to grapple with the fact that Minnesota's water quality standards do not protect subsistence fishing engaged in by Band members. Band members near the Project area or farther downstream will be affected more than the general population because mercury fish levels are already too high, and will be too high for subsistence fishing, even if

PolyMet complies with Minnesota's water quality standards.  As a result, Band members will need to refrain from engaging in subsistence fishing, which is a clear disproportionate effect that the Forest Service ignores.

133.   In addition, the Forest Service failed to follow CEQ guidance on mitigation because the FEIS does not identify mitigation measures that "reflect the need and preferences" of the Band to "the extent practicable."  CEQ Guidance at 16. The Band repeatedly commented on its preferences for mitigation related to moose, coniferous bogs, and the preservation of the BBLV Trail.

134.   The FEIS and ROD contain no meaningful consideration of the disproportionate impacts that the Mining Project would have on the Band as is required by Executive Order 12,898.

135.   Therefore, the Forest Service's analysis of environmental impacts and alternatives is arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with NEPA and its implementing regulations and the APA.  5 U.S.C. § 706(2)(A).

## COUNT III

### The Forest Service Failed to Properly Evaluate the Land Exchange and Mining Project's Impacts on the Band's Treaty Rights

136.   Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

137.   The APA requires the Court to "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C).

138.   The United States, including Defendants, has fiduciary duties to protect the Band's rights, including the Band's Treaty rights outside and within the Reservation, and to avoid taking actions that would impair these rights.  In carrying out its trust obligations, the United States "has charged itself with moral obligations of the highest responsibility and trust.  Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards." *Seminole Nation*, 316 U.S. at 296-97.

139.   The Forest Service has no authority to limit the Band's Treaty rights or take any action to impair such rights without Congressional authorization. Nevertheless, the Forest Service imposed a standard on the Treaty rights that required the Band to prove "present day or recent past subsistence gathering in the NorthMet Project area" as a necessary predicate to afford federal protection to the Treaty resources.  This limitation has no basis in the 1854 Treaty and is contrary to law.  *See* 10 Stat. 1109, art. 11; *Carlson*, No. 5-92-159.

140.   Because the Forest Service concedes that the Land Exchange and Mining Project will cause irreversible losses of Treaty resources, the Forest Service could not proceed with the Land Exchange without express Congressional authorization.  Congress has not provided such authorization to the Forest Service.

141.   In addition, the flaws in the FEIS and ROD for issues relevant to the Band renders the Forest Service's evaluation of the Band's Treaty rights arbitrary

and contrary to the record.  For example, the Forest Service gave no weight to its own findings that the Federal Land is subject to the Band's Treaty rights, including the Band's Conservation Code, or that the Land Exchange will result in natural resources which are culturally important to the Band based on its Treaty rights being irreversibly lost, such as moose habitat and coniferous bogs.  In direct contradiction to those admissions, the Forest Service contends that "overall" the Mining Project "is not likely to significantly reduce overall availability of 1854 Treaty resources that are typically part of subsistence activities in the 1854 Ceded Territory."  But the Forest Service did not evaluate Treaty resources in the Ceded Territory.

142.   The Forest Service drew arbitrary conclusions which ignored cultural practices that limited the Band from responding to the Forest Service's demand for "specific locations or uses within the NorthMet Project area."

143.   Therefore, the Land Exchange is arbitrary and capricious, an abuse of discretion, contrary to law, and otherwise not in accordance with the federal government's Treaty and trust responsibilities and the 1854 Treaty.  5 U.S.C. § 706(2)(A).

## COUNT IV

## The Forest Service's Determination of the Public Interest is Arbitrary and Capricious

144.   Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

145.   The APA requires the Court to "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

146.   The Weeks Act authorizes a land exchange only "[w]hen the public interests will be benefitted thereby."  16 U.S.C. § 516.

147.   FLPMA provides for the Secretary of Agriculture to conduct a land exchange "under applicable law" only "where the Secretary . . . determines that the public interest will be well served by making that exchange." 43 U.S.C. § 1716(a).

148.   Protection of the Band's Treaty rights is in the public interest.

149.   The Forest Service claimed the "public interest is well served" by the Land Exchange.

150.   However, the Forest Service failed to give "full consideration" to several factors in determining the public interest, such as the opportunity to secure important objective such as the protection of fish and wildlife habitats, cultural resources, watersheds, and wilderness and aesthetic values.  36 C.F.R. § 254.3(b). The Forest Service's public interest determination relied on the flawed FEIS to determine the public interest and approve the Land Exchange.  The flaws in the FEIS likewise undermine the Forest Service's determination of the public interest and decision on the Land Exchange.

151.   For the same reasons, the Forest Service's findings are arbitrary and contrary to the record.  The resource values and public objectives served by the Non-Federal Lands are not equal to those served by the Federal Land.  *See id.* §

254.3(b)(2). Further, PolyMet's intended use of the Federal Land for the Mining Project will substantially conflict with established management objectives on adjacent Federal Lands, including Indian Trust lands and protection of Treaty resources. *See id.* § 254.3(b)(2).

152. Therefore, the Forest Service's determination of the public interest is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 16 U.S.C. § 516; 43 U.S.C. § 1716(a); 36 C.F.R. § 254.3(b); 5 U.S.C. § 706(2)(A).

## COUNT V

## Violation of FLPMA's Equal Value Requirements

153. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

154. The APA requires the Court to "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C).

155. Assuming FLPMA's equal value requirements apply to exchanges under the Weeks Act, FLPMA requires the values of lands to be exchanged be equal, or if they are not equal, for the values to be equalized by a cash payment not to exceed 25% of the total value of the lands transferred out of federal ownership. 43 U.S.C. § 1716(b). Accordingly, FLPMA and the Forest Service's implementing regulations require an appraisal of the lands to be exchanged. *Id.* § 1716(d)(1); 36 C.F.R. § 254.9. The appraisal must be conducted in accordance with the Uniform Appraisal

Standards, 43 U.S.C. § 1716(f)(1); 36 C.F.R. § 254.9, and estimate the land's market value based on an appropriate determination of the land's highest and best use, *id.* § 254.9(b)(1), (b)(1)(i).   The appraisal must consider the historic, wildlife, scenic, cultural, ecological, and conservation values of the land.  *Id.* § 254.9(b)(1)(iii).

156.   The Forest Service arbitrarily instructed the appraiser to include the assumption that "3rd party owner of the outstanding mineral rights does not have the right to surface mine, and the property owner is entitled to subjacent support." This resulted in an undervaluation of the Federal Land and the Forest Service not receiving equal value for the Federal Land.

157.   The Appraisal also did not consider the historic, wildlife, scenic, cultural, ecological, and conservation resource values of the Federal Land, including whether conservation was the highest and best use.

158.   Because the Forest Service relied on an appraisal that was flawed, the Land Exchange violates the equal value requirements of FLPMA, 43 U.S.C. § 1716(b), and the Forest Service significantly undervalued the Federal Land to be exchanged.

159.   Therefore, the Forest Service's Land Exchange is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with FLPMA and the Forest Service's implementing regulations; and in excess of statutory authority.  43 U.S.C. § 1716; 36 C.F.R. § 254.9; 5 U.S.C. §§ 702, 706(2)(A), (C).

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff Fond du Lac Band of Lake Superior Chippewa prays that this Court grant it the following relief:

A. Declare that the Forest Service's Land Exchange is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and in excess of statutory authority in violation of the Weeks Act, FLPMA, NEPA, implementing regulations, the 1854 Treaty, and the United States' trust responsibility;

B. Vacate and set aside the Forest Service's transfer of the Federal Land to PolyMet including related regulatory and real estate transactions associated therewith;

C. Remand to the Forest Service for further action consistent with the Court's rulings;

D. Grant emergency, preliminary, and permanent injunctive relief requiring Defendants to order the PolyMet to suspend all activities in furtherance of the Land Exchange;

E. Retain jurisdiction over this matter to ensure that Defendants comply with the law;

F. Award plaintiff its reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation, pursuant to 28 U.S.C. § 2412; and

G. Grant plaintiff such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 24th day of January 2022.

*/s/ Sean W. Copeland*
Sean W. Copeland, (MN #387142)
Tribal Attorney
Fond du Lac Band of Lake
  Superior Chippewa
1720 Big Lake Road
Cloquet, Minnesota 55720
(218) 878-2632
seancopeland@fdlrez.com

Vanessa L. Ray-Hodge
*Pro Hac Vice* to be submitted
Sonosky, Chambers, Sachse,
  Mielke & Brownell, LLP
500 Marquette Avenue NW, Suite 660
Albuquerque, NM 87102
(505) 247-0147
vrayhodge@abqsonosky.com

Matthew L. Murdock
*Pro Hac Vice* to be submitted
Sonosky, Chambers, Sachse,
  Endreson & Perry, LLP
1425 K Street NW, Suite 600
Washington, DC 20005
(202) 682-0240
mmurdock@sonosky.com

*Attorneys for Plaintiff Fond du Lac Band of Lake Superior Chippewa*