UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| FOND DU LAC BAND OF LAKE SUPERIOR CHIPPEWA, | Case No. 22 CV 0170 (PJS/LIB) |
| Plaintiff, | |
| v. | |
| CONSTANCE CUMMINS, Supervisor of the Superior National Forest; RANDY MOORE, Chief of the U.S. Forest Service; UNITED STATES FOREST SERVICE; THOMAS VILSACK, Secretary of Agriculture; and UNITED STATES DEPARTMENT OF AGRICULTURE, | ORDER |
| Defendants, | |
| POLY MET MINING, INC., | |
| Intervenor Defendant. | |

Matthew L. Murdock, SONOSKY, CHAMBERS, SACHSE, ENDRESON & PERRY, LLP;  Sean W. Copeland, Tribal Attorney, FOND DU LAC BAND OF LAKE SUPERIOR CHIPPEWA; Vanessa L. Ray Hodge, SONOSKY, CHAMBERS, SACHSE, MIELKE & BROWNELL, LLP, for plaintiff.

Jay C. Johnson, VENABLE LLP; Monte A. Mills and Aaron P. Knoll, GREENE ESPEL PLLP, for intervenor defendant Poly Met Mining, Inc.

Plaintiff Fond du Lac Band of Lake Superior Chippewa ("the Band") brings this action against the United States Forest Service ("Forest Service") and other federal agencies and agency officials.  The Band seeks judicial review of a land exchange

between the Forest Service and intervenor defendant Poly Met Mining, Inc. ("PolyMet").

This matter is before the Court on PolyMet's motion to dismiss for lack of jurisdiction.[1] In particular, PolyMet contends that the Band lacks standing to challenge the land exchange. For the reasons that follow, the Court concludes that the Band has standing and therefore denies PolyMet's motion.

## I. BACKGROUND

The Band is a federally recognized Indian tribe and a member band of the Minnesota Chippewa Tribe. Compl. ¶ 9. In 1854, the Band — along with numerous other bands — signed the Treaty of LaPointe ("1854 Treaty" or "Treaty"), 10 Stat. 1109. Pursuant to the Treaty, the Band ceded a large portion of land in northeastern and east central Minnesota to the United States. Compl. ¶¶ 3, 17. Significantly for purposes of this case, Article 11 of the Treaty reserves the Band's right to hunt and fish throughout the ceded territory. Compl. ¶¶ 3, 17.

PolyMet proposes to build an open pit copper nickel mine (called the NorthMet Mine) within the ceded territory. Compl. ¶¶ 40 41. At the time that PolyMet first proposed the mine, the proposed site was not only within the ceded territory, but also within the Superior National Forest. Compl. ¶¶ 50, 54. The Forest Service held title to

---

[1] PolyMet also moves to dismiss on the basis of laches. For the reasons stated on the record at the hearing, this aspect of PolyMet's motion is denied without prejudice.

the proposed site, but PolyMet held mineral leases. A dispute arose between PolyMet and the Forest Service over whether PolyMet's leases gave it the right to construct and operate a mine. Compl. ¶ 51. To resolve this dispute, PolyMet and the Forest Service agreed to a land exchange under which the Forest Service would transfer title to the proposed mine site to PolyMet and PolyMet would transfer title to four tracts of private land to the Forest Service. Compl. ¶¶ 51, 53.

In January 2017, the Forest Service issued a Record of Decision approving the exchange. Compl. ¶¶ 1, 53, 60 64. The Band alleges that, as a result of the exchange, it has suffered a "loss of access to 6,650 acres of public land for exercise of the Band's Treaty rights." Compl. ¶ 9. The Band filed this action challenging the land exchange in January 2022.

## II. ANALYSIS

### A. Standard of Review

PolyMet raises a facial challenge to this Court's jurisdiction, arguing that the Band has failed to plead facts establishing that it has standing to seek judicial review of the land exchange. In resolving a facial challenge to standing, a court "restricts itself to the face of the pleadings" and affords the non moving party "the same protections as it would [have] defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citations omitted). The Court

therefore accepts as true all of the factual allegations in the complaint and draws all reasonable inferences in the Band's favor.  *Perez v. Does 1 10*, 931 F.3d 641, 646 (8th Cir. 2019).

### B.  Standing

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  To establish standing, a plaintiff must prove that it has suffered "[(1)] an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id.*  An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  To be fairly traceable, "there must be a causal connection between the injury and the conduct complained of."  *Lujan*, 504 U.S. at 560.  A causal connection is missing if the injury "results from the independent action of some third party not before the court."  *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41 42 (1976).  Finally, the redressability element requires that it "be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38, 43).

The Band alleges that it has suffered and will continue to suffer numerous injuries as a result of the land exchange. The Court need focus on only one alleged injury, however, as the Court finds that this injury is sufficient to confer standing: The Band's allegation that the land exchange "directly implicate[s] the Band's sovereign interests, including a treaty right to use the land for hunting, fishing, and gathering" and has resulted in a "loss of access to 6,650 acres of public land for exercise of the Band's Treaty rights." Compl. ¶ 9.

PolyMet contends that this allegation fails to establish standing because the Band had no legally cognizable interest in the exchanged property. Instead, PolyMet argues, the usufructuary rights created under the 1854 Treaty belong to individual Band members, not to the Band itself. And because the Band has failed to identify any Band member who used the property while it was public land, PolyMet contends that the Band lacks standing to challenge the land exchange under *Lujan* and similar cases. *See Lujan*, 504 U.S. at 564 (holding that members of environmental group failed to show any actual or imminent injury); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

Whether PolyMet is correct depends on the nature of the usufructuary rights reserved in the 1854 Treaty. "A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations." *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675, *modified sub nom. Washington v. United States*, 444 U.S. 816 (1979). When interpreting Indian treaties, courts "give effect to the terms as the Indians themselves would have understood them." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999). "[T]he treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." *Fishing Vessel*, 443 U.S. at 676 (quoting *Jones v. Meehan*, 175 U.S. 1, 11 (1899)). Interpreting a treaty thus requires "look[ing] beyond the written words to the larger context that frames the Treaty, including 'the history of the treaty, the negotiations, and the practical construction adopted by the parties.'" *Mille Lacs Band*, 526 U.S. at 196 (quoting *Choctaw Nation v. United States*, 318 U.S. 423, 432 (1943)). Any ambiguous term must be "liberally construe[d] . . . in favor of tribal interests." *United States v. Gotchnik*, 222 F.3d 506, 509 (8th Cir. 2000). Treaties "are to be read with the tradition of Indian sovereignty in mind." *Sac & Fox Tribe of Miss in Iowa. v. Licklider*, 576 F.2d 145, 150 (8th Cir. 1978).

As noted, PolyMet contends that the 1854 Treaty reserves an exclusively individual right to hunt and fish in the ceded territory.  As a general rule, however, Indian treaties grant (or reserve) rights to tribes, not to individuals.  *Sac & Fox Indians of Miss. in Iowa v. Sac & Fox Indians of Miss. in Okla.*, 220 U.S. 481, 484 (1911) ("The government did not deal with individuals, but with tribes."); *Blackfeather v. United States*, 190 U.S. 368, 377 (1903) ("The United States, as the guardian of the Indians, deal with the nation, tribe, or band, and have never, so far as is known to the court, entered into contracts, either expressed or implied, compacts, or treaties with individual Indians so as to embrace within the purview of such contract or undertaking the personal rights of individual Indians." (quotation marks omitted)); *Dry v. United States*, 235 F.3d 1249, 1256 (10th Cir. 2000) ("It is well settled that the very great majority of Indian treaties create tribal, not individual, rights." (cleaned up)); *United States v. State of Wash.*, 520 F.2d 676, 688 (9th Cir. 1975) ("Each tribe bargained as an entity for rights which were to be enjoyed communally. . . . The right to fish at usual and accustomed grounds was one such communal property right pertaining to the tribe."); *Settler v. Lameer*, 507 F.2d 231, 237 (9th Cir. 1974) ("the fishing rights reserved in the Treaty of 1855 are communal rights of the Tribe, even though the individual members benefit from those rights"); *United States v. Three Winchester 30 30 Caliber Lever Action Carbines*, 504 F.2d 1288, 1292 (7th Cir. 1974) ("The treaty rights allegedly abridged belong to the tribe as a whole and

not to any one individual."); *Hebah v. United States*, 428 F.2d 1334, 1337 (Ct. Cl. 1970) ("The very great majority of Indian treaties create tribal, not individual, rights, and the usual statements in the books are to that effect."); *Chippewa Cree Tribe of Rocky Boy's Rsrv. v. United States*, 73 Fed. Cl. 154, 159 (2006) (noting "legal precedent regarding the retention of the tribal, or group, character of treaty based rights even where financial payments may ultimately go to individual beneficiaries"); *N. Paiute Nation v. United States*, 10 Cl. Ct. 401, 409 (1986) ("In the great majority of Indian cases, the treaties or agreements involved created tribal rights and gave no rights to individual Indians.").

This is particularly true when property rights are at issue. *See Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 665 (1979) (rejecting the argument that "the word 'Indians' does not literally include an Indian tribe" because, at the time the original statute was enacted in the early nineteenth century, "Indian land ownership was primarily tribal ownership"); *State of Wash.*, 520 F.2d at 691 ("The fact that, in general, Indians held property communally has led the courts to hold that property rights, vis a vis the United States, are vested in the tribe not in the individual."); *N. Paiute Nation v. United States*, 8 Cl. Ct. 470, 481 (1985) ("The law and common notion of the day indicated that Indian land was tribally owned, and it is in that light that the 1902 Act and 1906 Agreement must be read"); *see also Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 351 (7th Cir. 1983) (noting that statutes purporting to

extinguish Indian treaty rights are governed by the same canons of construction as those governing Indian treaties).

Indeed, this general rule is so predominant that even references in treaties to rights or benefits for individual Indians may be construed to create tribal, rather than individual, rights. *Hebah*, 428 F.2d at 1337 ("This principle has been carried into effect even where a treaty provided for financial payments to specified beneficiaries out of annuities paid to the tribe; the holding was that, nevertheless, individual rights against the Federal Government were not created by the treaty."); *see also N. Paiute Nation*, 8 Cl. Ct. at 480 81 (holding that the claim at issue was tribal although "the literal statutory obligation would appear to flow to the individual Indians").

While there are exceptions to this general rule, the relevant language of the 1854 Treaty closely resembles the type of language that has traditionally been understood to create a tribal right. The 1854 Treaty is one of a series of treaties under which the Chippewa ceded millions of acres of land to the United States. *See generally Mille Lacs Band*, 526 U.S. at 176 85 (recounting history of Chippewa land cession treaties). The Treaty was concluded with two separate groups of Chippewa the Lake Superior Chippewa and the Mississippi Chippewa. *See* 1854 Treaty, 10 Stat. 1109. Each of these groups was, in turn, composed of a number of separate bands. *See id.* Art. 2 (describing the tracts of land reserved for separate Lake Superior bands, including the Fond du Lac

Band); *id.* Art. 12 ("It is understood that all Indians who are parties to this treaty, except the Chippewas of the Mississippi, shall hereafter be known as the Chippewas of Lake Superior.").

Article 11 of the Treaty, which contains the language at issue in this case, provides as follows:

> All annuity payments to the Chippewas of Lake Superior, shall hereafter be made at L'Anse, La Pointe, Grand Portage, and on the St. Louis River; and the Indians shall not be required to remove from the homes hereby set apart for them. And such of them as reside in the territory hereby ceded, shall have the right to hunt and fish therein, until otherwise ordered by the President.

*Id.* Art. 11. The relevant language, therefore, reserves hunting and fishing rights to "such of [the Indians] as reside in the territory hereby ceded."

References to "Indians" are generally understood to refer to tribes, not individual tribe members. *Fishing Vessel*, 443 U.S. at 679 ("The referent of the 'said Indians' who are to share the right of taking fish with 'all citizens of the Territory' is not the individual Indians but the various signatory 'tribes and bands of Indians' listed in the opening article of each treaty."); *Wilson*, 442 U.S. at 665 66 (holding that statutory reference to "Indians" referred to the tribe); *Blackfeather*, 190 U.S. at 374, 378 ("[T]he words 'Shawnee and Delaware Indians' mean the tribes, and not individual members of those tribes of Indians. . . . It is apparent that when Congress intends to include

-10-

individuals as distinct from tribes, it does not speak of them as Shawnee Indians, but as 'certain members' of the Shawnee tribe."); *State of Wash.*, 520 F.2d at 683, 688 (explaining that a treaty securing fishing rights to "said Indians" was referring to a "communal property right pertaining to the tribe"); *N. Paiute Nation*, 8 Cl. Ct. at 481 n.9 ("references to 'Indians' are usually construed as references to a Tribe").

The fact that the 1854 Treaty refers to "such of [the Indians] as reside in the territory" does not distinguish the 1854 Treaty from these precedents. In the context of the 1854 Treaty, the phrase "such of [the Indians] as reside in the territory" simply specifies which of the multiple bands that were signatories to the treaty had reserved their hunting and fishing rights in the ceded territory. *Cf. Sac & Fox Indians of the Miss. in Iowa*, 220 U.S. at 485 86, 489 90 (statute providing for per capita distribution of treaty payments that "shall apply only to the original Sacs and Foxes now in Iowa" did not create individual rights).

In contrast to the language of the 1854 Treaty, treaty provisions that create exclusively individual rights tend to specify that benefits or rights belong to the individual, unmediated by the tribe. *Cheyenne & Arapaho Tribes v. United States*, 151 Fed. Cl. 511, 517 18 (2020) (treaty language obligating the United States to "reimburse the injured *person*" created "a cause of action for individuals, not tribal governments"); *Sioux Tribe of Indians v. United States*, 89 Ct. Cl. 31, 32, 38 (1939) (holding that a claim

under treaty language granting "the head of a family or lodge" the right, under certain specified conditions, "to receive seeds and agricultural implements" was "not a tribal claim but concerns the rights of and obligations to individual Indians, members of the Sioux Tribe"); *cf. Hebah*, 428 F.2d at 1338 (holding that, as a third party beneficiary of a "treaty . . . made by the United States with the tribe, and not with individual Shoshonees," an individual could sue under clause giving "the injured person" a right to reimbursement).

Interpreting Article 11 of the 1854 Treaty to reserve a tribal right of usufruct is also consistent with the long history of federal litigation concerning the signatory bands' rights under that provision. *See, e.g.*, Minn. Stat. § 97A.157 (ratifying settlement of *Grand Portage Band of Chippewa v. Minnesota*, No. 4:85 CV 1090 (HHM) (D. Minn.), which was brought to enforce 1854 Treaty usufructuary rights); *Mille Lacs Band*, 526 U.S. at 187 (noting that, in Case No. 5:92 CV 0159 (D. Minn. Mar. 18, 1996), "the District Court held that the Fond du Lac Band retained its hunting and fishing rights" under the 1854 Treaty). Notably, the Minnesota Court of Appeals has specifically described the usufructuary rights reserved in the 1854 Treaty as tribal. *State v. Roy*, 761 N.W.2d 883, 886 (Minn. Ct. App. 2009) ("Thus, the hunting rights, which appellant argues have been abridged, belong to the tribe as a whole and not to any individual member of the tribe."); *State v. Shabaiash*, 485 N.W.2d 724, 726 (Minn. Ct. App. 1992) ("Treaties with the

Indians 'gave no vested rights to individuals' because the government dealt with the tribes and all promises were made to the tribes." (quoting *Sac & Fox Indians of Miss. in Iowa*, 220 U.S. at 483 84)).

True, this federal litigation over the 1854 Treaty seemed to involve individual band members as plaintiffs. *See, e.g., Grand Portage Band of Chippewa v. Minnesota*, No. 4:85 CV 1090 (HHM) (D. Minn.) (listing individual plaintiffs); *Fond du Lac Band of Chippewa Indians v. Carlson*, 5:92 CV 0159 (MJD/LIB) (D. Minn.) (listing individual plaintiffs). But the courts and the other litigants clearly treated the bands as having their own interests at stake; indeed, the parties appear to have treated the bands' interests as paramount, with the bands repeatedly entering into complex, court approved settlement agreements governing their usufructuary rights. *Shabaiash*, 485 N.W.2d at 725 ("In return for annual payments, the bands [involved in the 1985 Grand Portage case] agreed not to exercise the hunting and fishing rights claimed under the 1854 treaty; rather, they would exercise any hunting, fishing, and gathering rights under conservation codes promulgated by the band governments after approval by the State of Minnesota."); Minn. Stat. § 97A.157 (approving settlement of the 1985 Grand Portage case); *Fond du Lac Band*, Case No. 5:92 CV 0159 (MJD/LIB), ECF No. 483 1 (2017 memorandum of understanding between the Band and Minnesota concerning 1854 Treaty rights); *id.* ECF Nos. 486 87 (order and judgment incorporating stipulation

between Minnesota and the Band concerning the Band's exercise of Treaty rights and retaining continuing jurisdiction to resolve future disputes over those rights).

The Court therefore finds that the usufructuary rights reserved in the 1854 Treaty belong to the Band, and not solely to individual members of the Band.[2] For that reason, the Court rejects PolyMet's argument that, to establish standing, the Band is required to show that individual Band members were hunting or fishing on the exchanged land at the time of the exchange.

As noted earlier, PolyMet relies on cases such as *Lujan*, in which environmental advocacy groups complained of environmental injuries. In such cases, however, the

---

[2]The Court notes that, although the rights are tribal in nature, individual members may nevertheless have standing to assert them, at least in certain circumstances. *See United States v. Brown*, 777 F.3d 1025, 1032 (8th Cir. 2015) ("It is well settled . . . that an individual Indian may assert usufructuary rights in a criminal prosecution."); *see also United States v. Winans*, 198 U.S. 371, 381 (1905) (noting that while "negotiations were with the tribe," the treaty reserved fishing rights to "every individual Indian"); *United States v. Fox*, 573 F.3d 1050, 1054 (10th Cir. 2009) ("The right of user in a tribal right to hunt or fish confers 'a personal right' upon which an individual member of the tribe may rely."); *United States v. Felter*, 752 F.2d 1505, 1509 (10th Cir. 1985) ("The right to hunt and fish on reservation land is a long established tribal right. Individual Indians, however, enjoy a right of user in the tribe's hunting and fishing rights." (citation omitted)); *Kimball v. Callahan*, 590 F.2d 768, 773 (9th Cir. 1979) ("an individual Indian enjoys a right of user in tribal property derived from the legal or equitable property right of the Tribe of which he is a member"); *see also United States v. Dion*, 476 U.S. 734, 738 n.4 (1986) (citing *Winans*, *Kimball*, and *Felter* for the proposition that "[s]uch treaty rights can be asserted by Dion as an individual member of the Tribe").

organizational plaintiff typically lacked any interest of its own that would have distinguished it from the general public:

> The Sierra Club is a large and long established organization, with a historic commitment to the cause of protecting our Nation's natural heritage from man's depredations. But if a "special interest" in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide "special interest" organization however small or short lived. And if any group with a bona fide "special interest" could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so.

*Sierra Club v. Morton*, 405 U.S. 727, 739 40 (1972).

Hence, when such organizations sue in federal court, they generally assert the interests of their members and those members, because they generally have no other legally protected interests at stake, typically assert recreational or aesthetic interests. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."). To establish an actual (as opposed to hypothetical) injury to such recreational or aesthetic interests, the member must allege specific, concrete plans to use and enjoy the natural resources at issue. *See, e.g.*, *Lujan*, 504 U.S. at 563 64 (holding that an affiant's expressed intent to visit an area at some unspecified time in the future was insufficient to establish

an Article III injury); *Ouachita Watch League v. U.S. Forest Serv.*, 858 F.3d 539, 542 (8th Cir. 2017) ("Having a specific and concrete plan to enjoy the national forests distinguishes a particular harm to a recreational interest from mere generalized harm." (cleaned up)).

This line of cases is simply inapplicable here. The Band is not merely a private association of like minded individuals asserting recreational and other interests in public land to which they have no greater right than members of the general public. *See United States v. Mazurie*, 419 U.S. 544, 557 (1975) ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory."). Unlike the organizational plaintiffs in *Lujan* and similar cases, the Band is asserting its *own* sovereign treaty rights treaty rights that are in the nature of a property right. *Cf. Menominee Tribe of Indians v. United States*, 391 U.S. 404, 413 (1968) (recognizing that abrogating usufructuary rights could potentially subject the government to a claim for compensation); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians*, 700 F.2d at 358 (same); *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse Wisconsin, Inc.*, 759 F. Supp. 1339, 1350 (W.D. Wis. 1991) ("I conclude that to the extent the private defendants have prevented plaintiffs from exercising their fishing rights, they have violated the right to use their property that is guaranteed plaintiffs under 42 U.S.C. § 1982.").

PolyMet contends that this tribal property right is no different from any other right to use or visit public lands. But the Supreme Court has repeatedly rejected the argument that treaty usufructuary rights give no greater rights than those enjoyed by the general public, noting that such an interpretation would reserve "no rights but such as [the Indians] would have without the treaty." *Winans*, 198 U.S. at 380 (describing such an interpretation as "an impotent outcome to negotiations and a convention which seemed to promise more"); *Fishing Vessel*, 443 U.S. at 678 79 ("Because the Indians had always exercised the right to meet their subsistence and commercial needs by taking fish from treaty area waters, they would be unlikely to perceive a 'reservation' of that right as merely the chance, shared with millions of other citizens, occasionally to dip their nets into the territorial waters.").

The Court therefore concludes that the Band has adequately alleged that it has standing and thus that this Court has Article III jurisdiction because the Band has alleged that the challenged land exchange directly injured the Band by physically diminishing the scope of the Band's treaty usufructuary rights. *Cf. Massachusetts v. E.P.A.*, 549 U.S. 497, 522 (2007) (state's loss of coastal property due to rising sea levels was a "particularized injury" for purposes of Article III standing). PolyMet's motion to dismiss is denied.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT the motion of intervenor defendant Poly Met Mining, Inc. to dismiss [ECF No. 34] plaintiff's complaint [ECF No. 1] is DENIED.

Dated:  February 24, 2023         s/Patrick J. Schiltz
                                  Patrick J. Schiltz, Chief Judge
                                  United States District Court